UNITED STATES v. CHICAGO, M. & ST. P. RY. CO. et al.

(District Court, D. Idaho, N. D.   September 18, 1915.)

ALIENS ⊚⟶50—ALIEN CONTRACT LABOR LAW—VIOLATION.

A section foreman of defendant railroad company was indebted to an alien, who had formerly worked under him, but had later returned to his own country, and gone from there to Canada. Being unable to pay the debt when requested, the foreman sent his creditor sufficient of his own money to pay traveling expenses and offered to re-employ him if he would return to this country, which offer was accepted. The foreman was authorized by defendant to employ men when needed on his section, if they applied or could be obtained in the immediate vicinity, but not otherwise. Held that, under such facts, defendant was not chargeable with violation of Alien Contract Labor Law (Act Feb. 20, 1907, c. 1134) § 4, 34 Stat. 900 (Comp. St. 1913, § 4248); it not appearing that any officer or other agent knew of the transaction.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 108–110; Dec. Dig. ⊚⟶50.]

⊚⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action by the United States against the Chicago, Milwaukee & St. Paul Railway Company and W. D. Tuttle. Judgment for defendants.

J. L. McClear, U. S. Atty., and J. R. Smead, Asst. U. S. Atty., both of Boise, Idaho.

Geo. W. Korte, of Seattle, Wash., and Robt. H. Elder, of Cœur d'Alene, Idaho, for defendants.

DIETRICH, District Judge. This is an action brought by the government to recover from the defendants the prescribed penalty of $1,000 for the alleged violation of section 4 of the Alien Immigration Act of February 20, 1907 (34 Stat. 898). The case is submitted upon the deposition of John Spiros, the alien involved, and certain additional probative facts set forth in a written stipulation signed by counsel for the respective parties. If the defendant corporation is liable at all, such liability grows out of, and is a result of, the acts of its co-defendant, W. D. Tuttle, while in its employ. Upon motion of the district attorney, the cause has been dismissed as to the defendant Tuttle.

It seems that Spiros first came to this country from Greece in 1909. While here he was engaged for about two years as a section laborer for the defendant company, under the direction of the defendant Tuttle as section boss. Thereafter he returned to Greece, where he remained for 14 months, and then again came back to America, taking employment at Fraser Mills, British Columbia. It further appears that before he left this country he had loaned to Tuttle $500, and the larger part of this was still due him upon his return from Greece. Of date August 24, 1914, he wrote to Tuttle from Fraser Mills, advising him that he had recently returned, and also informing him that he was without work and without money, and requested that he send him funds by telegraph. Tuttle replied from Plummer, Idaho, stating that he had been unfortunate, and suggesting that if he (Spiros) would come to him, he would try to get him a job and would gradually pay the debt. At that time Tuttle was working for the defendant corporation as a common laborer, and was without any authority to act as its agent in any capacity. A short time afterwards he again secured a position as section foreman, and thereupon, on September 29, 1914, he wrote to Spiros, inclosing $25 of his own money for the payment of traveling expenses, and requested him to come to Plummer and take a job under him upon the section. Spiros came and was put to work as section laborer. So far as appears, no officer or agent of the defendant company, other than Tuttle, knew that Spiros was an alien, or knew any of the circumstances of his coming to Plummer.

Section 5 of the Alien Immigration Act provides that any person or corporation violating the provisions thereof "by knowingly assisting, encouraging, or soliciting the migration or importation of any contract laborer into the United States shall forfeit and pay for every such offense the sum of $1,000." Comp. St. 1913, § 4250. The act has been construed in United States v. Regan, 232 U. S. 37, 34 Sup. Ct. 213, 58 L. Ed. 494, Grant Bros. v. United States, 232 U. S. 647,

34 Sup. Ct. 452, 58 L. Ed. 776, and United States v. Great Northern Ry. Co., 214 Fed. 46, 130 C. C. A. 486.

The primary question is of the extent of Tuttle's agency for the defendant corporation. Notice will be taken of the fact that ordinarily a section foreman exercises a very limited authority. Here it is expressly stipulated that at the time he wrote the last letter referred to, and sent the money to Spiros, Tuttle was section foreman at the station of Pedee; that he had been similarly employed for a period of several years, at a time shortly prior to that date; that generally his duties were to care for the track and supervise the work of the men in his gang; and that he—

"was authorized to employ such men as might be necessary to work upon the said section of railroad, if such men should ask for employment in person at said Tuttle's headquarters at a time when they were needed on said section, or if they could be obtained in the immediate neighborhood of said section; that said Tuttle was not authorized to make any contract of employment which would be binding upon the said railway company under circumstances other than the foregoing; and that if he needed men to work upon said section, and such men could not be obtained at his said headquarters or in the immediate neighborhood thereof, he was authorized to requisition such men from either the roadmaster of the defendant company or the division superintendent."

With this definition of the character and extent of his agency, I think it must be held that in arranging with Spiros or encouraging him to come Tuttle was not acting in the line of his duty or within the scope of his authority. Spiros was at the time hundreds of miles away from Pedee, and not only without the boundaries of the state, but in a foreign country. Moreover, the evidence leaves no doubt in my mind that, in engaging Spiros, Tuttle was not acting primarily for his employer, but upon his own behalf and in his own interest. It is also clear that, had the relation of debtor and creditor not existed between him and Spiros, the latter would not have come to the United States at all. Tuttle was unable to pay his debt, and was endeavoring to secure forbearance from his creditor by bringing him to Idaho, and the latter hoped to hasten the collection of the debt by coming. The first suggestion from Tuttle was, not that Spiros should go into the service of the railroad company, but into some other line of work.

It is further clear that the moving consideration which induced Spiros to come was not the promise of employment, but the hope of being able to collect his money. He appears to have testified frankly and fairly, and his positive statement is that he had satisfactory employment where he was, and by reason of the fact that his brother was near him he did not desire to come back to the United States. I entertain no doubt that, had Tuttle paid him in full upon his arrival, he would have immediately returned to Canada. To be sure, without the promise of employment, he would not have come to the United States; but it still remains true that he did not come to get employment. He came for his money. He was a poor man, and could not afford to give up his job in Canada and stay here in idleness until Tuttle could raise what was due him. But the job was not what he came for; and, as already suggested, he did not stay for that purpose.

Employment was the condition of his staying, rather than the object of his coming, or the inducement which brought him. Work he had in Canada, and there he preferred to stay, for the reasons just explained.

Now, to hold that in such a case, where a subordinate employé of a corporation, with limited agency, has exceeded his authority, for the purpose of furthering his own private interests, the corporation becomes chargeable with the commission of a crime and subject to the payment of a heavy penalty, would in my judgment be to place a most unreasonable construction upon the law, and to extend its operation beyond the limits of what is reasonably necessary to effectuate its manifest purpose and intent. I am unwilling to put upon it such a strain. The case is clearly an isolated one. There has been, and, under the stipuation, there could be, no suggestion that such or similar practices were or are common, or are resorted to for the purpose of evading the provisions of the statute. Responsibility might be imposed upon the company by a knowledge of, and acquiescence in, the unauthorized acts of an employé; but there are no facts here warranting the application of such a principle. Upon the whole, the transaction was for Tuttle's benefit alone; Spiros was not in need of employment, and the railroad company was not in need of his services. So far as appears, section men could have been procured near at hand. Tuttle was without authority to go into a foreign land to secure laborers.

The government conceded that the railroad company had limited his authority to the immediate vicinity of his section, and presumably this limitation was imposed for some purpose. May not this purpose have been the prevention of that which here took place? But, however that may be, the company had the right to impose the limitation, and it cannot be held liable for an act which it did not authorize or ratify. The suggestion is made that the limitation is wanting in certainty, and that inasmuch as Tuttle, acting in good faith, assumed that he had the right to engage the services of Spiros, the company is therefore bound. But while the phrase "immediate neighborhood," or "immediate vicinity," may be somewhat elastic and indefinite, under no reasonable construction could it be extended to reach out and include a foreign locality, hundreds of miles away from the point where Tuttle was employed.

Accordingly judgment will be entered dismissing the action.